IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RICHARD P. IEYOUB, Sr., both individually and on behalf of all others similarly situated, | § § § § § | |
| Plaintiffs, | § § § | |
| v. | § § | Civil Action No. |
| SOUTHWEST AIRLINES CO., AMERICAN AIRLINES, INC., DELTA AIR LINES, INC., and UNITED AIRLINES, INC., | § § § § § | |
| Defendants. | § | JURY TRIAL DEMANDED |

## ORIGINAL CLASS ACTION COMPLAINT

Plaintiff Richard P. Ieyoub, Sr., by his undersigned attorneys, files this original class action complaint against defendants Southwest Airlines Co., American Airlines, Inc., Delta Air Lines, Inc., and United Airlines, Inc. (collectively, the "Airline Defendants"). Plaintiff brings this civil antitrust action, both individually and on behalf of a class of all those similarly situated, for treble damages under the antitrust laws of the United States. The action arises from the Airline Defendants' conspiracy to fix, raise, maintain, or stabilize prices of airline tickets in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

### I.   NEED FOR ACTION

1.   Since at least January 2010, the Airline Defendants colluded to limit increases in their carrying capacity, thereby artificially driving up airfares and taking money out of purchasers' pockets. At the same time, the Airline Defendants have tacked on additional fares for change fees and baggage that have contributed to their profit margins. The Airline Defendants' actions violate the

antitrust laws and fly in the face of expected economic behavior in a competitive industry. Plaintiff, like the unnamed members of the proposed class, suffered injuries as a result of these actions.

2.      Plaintiff and the proposed class seek the protections of the Court (a) to obtain injunctive relief against such similar acts in the future, (b) to recover damages, including treble damages, for the Airline Defendants' actions, and (c) to recover costs of suit, including reasonable attorney's fees as well as any other appropriate relief. Accordingly, Plaintiff brings suit here under section 1 of the Sherman Act, 15 U.S.C. § 1, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

## II.     PARTIES

3.      Richard P. Ieyoub, Sr. is a resident of Louisiana. Plaintiff purchased one or more tickets directly from the Airline Defendants, including specifically Southwest, American, Delta and United, during the proposed Class Period (January 1, 2010, to the present).

4.      Southwest Airlines Co. ("Southwest") is a Texas corporation with its headquarters in Dallas, Texas. Southwest may receive service of process through Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.

5.      American Airlines, Inc. ("American") is a Delaware corporation with its headquarters in Fort Worth, Texas. It is a subsidiary of American Airlines Group Inc., also a Delaware Corporation with its headquarters in Fort Worth, Texas. American may receive service of process through CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

6.      Delta Air Lines, Inc. ("Delta") is a Delaware corporation with its headquarters in Atlanta, Georgia. Delta may receive service of process through Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.

7. United Airlines, Inc. ("United") is a Delaware corporation with its headquarters in Chicago, Illinois. It is a wholly owned subsidiary of United Continental Holdings, Inc., a Delaware corporation with its headquarters in Chicago, Illinois. United may receive service of process through CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

### III. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over the Sherman Act claim pursuant to 28 U.S.C. §§1331, 1337, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

9. This Court has personal jurisdiction over the Airline Defendants. Each of the Airline Defendants purposefully availed itself of the privilege of engaging in activities in Texas. Each of the Airline Defendants actively conducts business in Texas. And both Southwest and American maintain headquarters within Texas.

10. Venue is proper in the Northern District of Texas pursuant to sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) because, during the proposed Class Period one or more of the Airline Defendants resided, transacted business, were found, or had agents in this district, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out in this district.

### IV. FACTS

11. Since at least January 2010, the Airline Defendants colluded to limit increases in their capacity with the expectation, intent, and effect that such limits on capacity would artificially increase prices for airfare. The Airline Defendants achieved the design of their agreement. Capacity within the cartel has remained relatively flat in the face of contrary economic influences, such as high demand and low costs. And the Airline Defendants have reaped the rewards of their artificially high

prices to yield record-high revenues in the same period. These gains come at the expense of the direct purchasers, such as the Plaintiff and the proposed class.

**The Airline Defendants restricted capacity despite improving economic conditions and significant fuel cost savings.**

12. Since January 2010, the United States economy has been rebounding, with the economy growing at an average clip of 2.2%. During that same period, increasing numbers of consumers have made their way to airports to sit on crowded flights after paying high ticket prices.

13. In the past twelve months, a dramatic decline in oil prices has further spurred economic growth. During that same period, airlines like the Airline Defendants have seen the cost of their fuel oil drop precipitously. In April 2015, U.S. airlines paid nearly $1.50 less per gallon for jet fuel oil than they did the prior year. Moody's, one of the major rating agencies, estimates U.S. airlines will spend $15 billion less on fuel in 2015 relative to 2014, net of hedging.

14. Under these conditions, i.e., <u>increases</u> in demand coupled with <u>decreases</u> in fuel costs, economists would expect rational market participants to increase capacity, resulting in additional seats and lower rates. But the Airline Defendants did not act in this manner.

15. The Airline Defendants, instead, took opposite steps. From January 2010 through December 2013, they maintained virtually flat capacity, forcing the flying public to pay higher prices for seats on cramped flights.

16. When capacity is limited, airlines can fill the available seats at higher average prices. Fewer customers are served at higher prices, and overall consumer welfare is lower.

**The Airline Defendants collectively embraced "discipline" in capacity and used industry conferences and other mechanisms to signal their agreement.**

17. Each of the Airline Defendants maintained these restrictions on capacity through illegal agreements with the other Airline Defendants.

18. The Airline Defendants utilized industry conferences and other mechanisms to reinforce their agreement to restrict capacity, which they referred to as "discipline."

19. The CEO of United told analysts and reporters that: "We're going to run the airline for profit maximization, and we're very focused on capacity discipline . . . . We will absolutely not lose our capacity discipline."

20. The CEO of Delta echoed the agreement: "We are not making any changes to our 2015 capacity plan in light of the lower fuel prices . . . . In fact, we continue to trim capacity on the margin to maintain yields and our RASM premium . . . . You've got to run the company conservatively, and we're trimming capacity as we speak."

21. The CFO of American similarly stated that American is not changing its capacity plans: "You won't see any changes from us in the near future."

22. In June 2015, the world's top airline executives met at the annual International Air Transportation Association ("IATA") conference in Miami. At this meeting, Delta's president, Ed Bastian, stated that Delta was "continuing with the discipline that the market place is expecting." American's chief, Doug Parker, stated that the airlines had learned their lessons from past price wars: "I think everybody in the industry understands that," he told Reuters.

23. Notably, the agreements caused some of the Airline Defendants to abandon planned expansion. In May 2015, Southwest's chief executive, Gary C. Kelly, had considered breaking ranks and announced that Southwest would expand capacity in 2015 by as much as 8 percent, with the expansion spilling over into 2016. However, after coming under fire at the IATA conference, Mr. Kelly, in June 2015, changed his position: "We have taken steps this week to begin pulling down our second half 2015 to manage our 2015 capacity growth, year-over-year, to approximately 7 percent."

24. Fiona Scott Morton, professor of economics at Yale and a former deputy attorney general in the antitrust division of the Justice Department, explained the notion of capacity

discipline within the airline industry: "When airline industry leaders say they're going to be 'disciplined,' they mean they don't want anyone to expand capacity. And when there aren't enough seats, airlines raise prices. That's what we've been seeing."

**The Airline Defendants reaped the benefits of their illegal agreements.**

25. The collusive restrictions yielded benefits. Domestic airlines have been booking record profits. Indeed, in the past two years alone, domestic airlines combined have taken $19.7 billion in profits.

26. The average domestic airfare rose an inflation-adjusted 13 percent from 2009 to 2014, according to the Bureau of Transportation Statistics. And that figure does not include billions of dollars airlines have earned from new fees, including baggage fees. Similarly, Defendants' passenger yields[1] have increased considerably since 2009, notwithstanding the precipitous drop in fuel cost and relatively low inflation.



Growth in Yields by Defendants versus US Inflation

Source: Airline data is from US DOT Form 41 via BTS, Schedule T2 & P12 (as compiled by MIT Global Airline Industry Program "Airline Data Project;" US Inflation as reported by the St. Louis Federal Reserve.
Note: All data is an average of the monthly values from the stated year. All yield values are shown relative to 2009 as a base year.

---

[1] Passenger yields are the aviation industry's measure of trends in airfares, and are calculated as the average fare paid per passenger per mile flown. Yields are generally presented in cents per mile and used to measure changes in fares over time.

**The domestic air transportation market's structure and characteristics render the Airline Defendants' conspiracy more plausible.**

27. The domestic air transportation market's structure and characteristics are conducive to a price-fixing conspiracy, and have made collusion particularly attractive in this market. Specifically, the domestic air transportation market (1) is highly concentrated, (2) has high barriers to entry, and (3) is subject, at least in part, to inelasticity of demand.

28. **High Concentration.** Economists know that a highly concentrated market is more susceptible to collusion and other anticompetitive practices. To say the domestic airline industry is highly concentrated states the obvious. After years of mergers and consolidation, the Airline Defendants control approximately 80 percent of the domestic air transportation market and dwarf their competition:



Market Share as of December 2014

29. The chart below demonstrates the history of consolidation within the domestic airline industry. After the recent merger between US Airways and American, the Airline Defendants each enjoyed their highest market share in their respective histories.



30.     The abovementioned consolidation is also reflected by the Herfindahl-Hirschman Index ("HHI"), a common measure of market concentration.



Increased concentration in an industry (i.e. the reduction of the number of firms in an industry) increases the sustainability of a cartel.

31.     The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. The HHI takes into account the relative size distribution of the firms in a market. It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a single firm controls a market. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

32.     **High Barriers to Entry**. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where significant barriers to entry exist, however, new entrants are less likely. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

33. Substantial barriers preclude, reduce, or make more difficult entry into the air transportation market. A new entrant into the business would face costly and lengthy start-up costs, including multi-billion dollar costs associated with the purchase of aircraft and equipment, energy, transportation, and infrastructure. In addition, new entrants would face significant costs related to the cost, complexity, and administrative and regulatory burdens associated with obtaining Federal Aviation Administration ("FAA") certification, as well as ongoing compliance with FAA, U.S. Department of Transportation, and other federal, state, and local government entities.

34. The Airline Defendants recognize these barriers to entry and rely on their effect to achieve the goal of their illegal agreements.

35. **Inelasticity of Demand**. Elasticity describes the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be inelastic if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

36. Cartels profit from raising prices above competitive levels where relatively inelastic demand exists at competitive prices in order for the revenue gain from the price increase to offset the associated decline in volume. Otherwise, increased prices would result in declining volumes, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand represents a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

37. Demand for airline tickets may be highly inelastic, particularly with respect to business travelers traveling between major markets, because there are no close substitutes for air transportation services. Moreover, the Airline Defendants maintain a high-level awareness of changes, if any, in demand on their produces.

**Government investigations seek to uncover details behind the illegal agreements.**

38. In December 2014, U.S. Senator Charles Schumer (D-N.Y.) called for a federal investigation of U.S. airlines amid falling gas prices. Senator Schumer explained the need to investigate: "At a time when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity. . . . So I'm urging the feds to step in and do a price investigation on behalf of consumers who must buy holiday travel tickets that can break the bank."

39. In mid-June 2015, U.S. Senator Richard Blumenthal (D-Conn.) asked the Department of Justice to investigate collusion and anti-competitive behavior amongst U.S. airline companies following a meeting of top executives at the IATA annual conference.

40. In his letter to Assistant Attorney General William Baer, Senator Blumenthal noted the previously described IATA conference, describing the comments by the heads of Delta and American as follows:

> At best, these remarks reflect participants in an overly consolidated market aligning supracompetitive fares. **At worst, they may be a strategic attempt to coordinate behavior—specifically designed to encourage Wall Street to punish smaller rival airlines that have announced plans to expand capacity and cut prices.**

41. Senator Blumenthal went on to note the change in Southwest's expansion plans:

> Last month, the CEO of Southwest Airlines declared plans to expand capacity by as much as eight percent, which many in the industry viewed as a preface to cutting fares. However, as reported in the Times, "after coming under fire at this week's conference, Southwest quickly moved to reassure investors it isn't going rogue. 'We have taken steps this week to begin pulling down our second half 2015 to manage our 2015 capacity growth...,' [Southwest's CEO] said." **The conclusion seems inescapable that the remarks made at the IATA conference were targeted at Southwest, and that its capitulation was the result of the "fire" aimed at the company.** Given the history of collusive behavior the Antitrust Division uncovered in its review of the proposed US Airways / American Airlines merger, these coordinated comments and their ultimate result necessitate your immediate attention.

42. On or around July 1, 2015, the Department of Justice confirmed that it had launched an investigation into potential unlawful coordination among the Airline Defendants. To that end, the U.S. Department of Justice sent civil investigatory demand ("CID") letters to each of the Airline Defendants. The CID letters demanded copies of all communications the Airline Defendants had with other domestic airlines, Wall Street analysts, and major shareholders about their plans for passenger-carrying capacity, or "the undesirability of your company or any other airline increasing capacity." Notably, other major carriers, including Alaskan Airlines and JetBlue, did not receive CID letters.

43. Each of the Airline Defendants have confirmed receipt of the CIDs and indicated that they are complying with the requests.

## V.   CLASS ACTION ALLEGATIONS

44. Plaintiff brings this action as a class action under Rule 23(a), 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks to certify a class action under federal antitrust laws on behalf of the following proposed class:

> All persons and entities who purchased a ticket directly from any of the Airline Defendants (excluding any of the Airline Defendants, their employees, and their respective parents, subsidiaries and affiliates) from January 1, 2010 to present.

45. Due to the nature of the trade or the commerce involved, Plaintiff does not know the exact number of class members involved. But Plaintiff believes that the proposed class numbers in the millions. Plaintiff believes that unnamed class members are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all class members would be impracticable.

46. Plaintiff is a member of the proposed class. Plaintiff's claims are typical of the claims of the proposed class. And Plaintiff will fairly and adequately protect the interests of the proposed

class. Plaintiff and members of the proposed class purchased tickets from the Airline Defendants at artificially maintained, supra-competitive prices established by the actions of the Airline Defendants as alleged herein. Plaintiff's interests are coincident with and not antagonistic to those of the other members of the proposed class.

47. Plaintiff is represented by counsel, who are competent and experienced in the prosecution of complex class action litigation.

48. The prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Airline Defendants.

49. Questions of law and fact common to the proposed class predominate over any questions affecting only individual members of the proposed class, including legal and factual issues relating to liability, damages, and restitution. Among the questions of law and fact common to the proposed class include the following questions:

    a. Whether the Airline Defendants colluded to fix, raise, and/or stabilize airfares in the United States;

    b. Whether the Airline Defendants' actions violated section 1 of the Sherman Act, 15 U.S.C. § 1.

    c. The duration of the conspiracy alleged in this complaint;

    d. The participants in the conspiracy alleged in this complaint; and

    e. The amount of damages caused by the Airline Defendants' actions.

50. A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment

will also permit the adjudication of claims by many members of the proposed class who could not individually afford to litigate an antitrust claim such as is asserted in this complaint. This class action likely presents no difficulties in management that would preclude maintenance as a class action. Finally, the proposed class is readily ascertainable.

## VI.   CAUSES OF ACTION

**Count 1— Violation of Section 1 of the Sherman Act.**

51. Plaintiff re-alleges and incorporates by reference all the above allegations as if fully set forth herein.

52. During Class Period, the Airline Defendants entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating domestic airfare competition in the United States.

53. In particular, the Airline Defendants agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of domestic airfare in the United States, by among other means restricting capacity.

54. As a result of the Airline Defendants' unlawful conduct, domestic airfares were raised, fixed, maintained, and stabilized in the United States.

55. The Airline Defendants' combination or conspiracy consisted of a continuing agreement, understanding, and concerted action among the Airline Defendants.

56. The Airline Defendants' conspiracy had the effect of artificially inflating the price of domestic airfare charged in the United States.

57. As a direct and proximate result of the Airline Defendants' unlawful conduct, Plaintiff and the other members of the proposed class paid more for domestic airfare than they otherwise would have paid in the absence of the Airline Defendants' unlawful conduct.

## VII. JURY DEMAND

58. Plaintiff is entitled to, and demands, a trial by jury.

## VIII. PRAYER

59. Plaintiff requests that the Court enter judgment on his behalf and on behalf of the proposed class alleged herein, adjudging and decreeing as follows:

    a. This action may proceed as a class action, with Plaintiff as the designated representative of the proposed class and his counsel as counsel for the proposed class;

    b. The Airline Defendants have engaged in combination and conspiracy in violation of section 1 of the Sherman Act (15 U.S.C. § 1), and Plaintiff and the members of the proposed class have been injured in their business and property as a result of the Airline Defendants' violation;

    c. Plaintiff and members of the proposed class may recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and members of the proposed class be entered against the Airline Defendants in an amount to be trebled in accordance with such laws;

    d. The Airline Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf be enjoined and restrained permanently from unlawfully restricting capacity and such other actions as the Court may specify;

    e. Plaintiff and members of the proposed class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

   f. Plaintiff and members of the proposed class recover their costs of this suit, including reasonable attorney's fees as provided by law; and

   g. Plaintiff and members of the proposed class receive such other or further relief as may be just and proper.

Dated: July 10, 2015.

              Respectfully submitted,

              */s/Mazin A. Sbaiti*
              Mazin A. Sbaiti, Esq.
              Tex. Bar No. 24058096
              STECKLER LLP
              12720 Hillcrest Rd.
              Suite 1045
              Dallas, Texas 75230
              Telephone: (972) 387-4040
              Facsimile: (972) 387-4041
              Mazin@stecklerlaw.com

              Arthur M. Murray
              State Bar No. 24059337
              Stephen B. Murray, Jr.
              *pro hac* admission to be applied for
              Robin M. Primeau
              *pro hac* admission to be applied for
              MURRAY LAW FIRM
              650 Poydras Street, Suite 2150
              New Orleans, Louisiana 70130
              Telephone: (504) 525-8100
              Facsimile: (504) 584-5249
              amurray@murray-lawfirm.com
              smurrayjr@murray-lawfirm.com
              rmyers@murray-lawfirm.com

              **Attorneys for Plaintiff**